FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Mar 06, 2025

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| KARLA BOE, and GARBIEL BOE, individually, and in their capacities as parents and guardians of minor student, O.B., and GRACIE BOE, individually, | NO. 2:23-CV-0319-TOR |
| | ORDER ON MOTIONS |
| Plaintiff, | |
| v. | |
| MEAD SCHOOL DISTRICT, | |
| Defendant. | |

BEFORE THE COURT are Plaintiffs' Motion for Partial Summary

Judgment (ECF No. 21), Plaintiffs' Motion to File Excess Pages (ECF No. 20),

Defendant's Motion to Exclude Testimony of Amy Klosterman (ECF No. 24),

Defendant's Motion for Partial Summary Judgment (ECF No. 26), Defendant's

Motion to Strike (ECF No. 51), Plaintiffs' Motion to Strike (ECF No. 53), and

Defendant's Motion to Amend Answer to RFA No. 2 (ECF No. 62). These matters

ORDER ON MOTIONS ~ 1

were submitted for consideration without oral argument.  The Court has reviewed the record and files herein and is fully informed.

## I.  BACKGROUND

This case concerns claims arising under the Rehabilitation Act of 1973 ("Section 504"), the Americans with Disabilities Act ("ADA"), and several state-law claims including negligence, bystander negligent infliction of emotional distress, and a loss of consortium.  ECF No. 1.  The following facts are undisputed unless noted otherwise.

O.B., currently sixteen-years old, was diagnosed with attention-deficit/hyperactivity disorder ("ADHD") in 2015 when he was seven-years old.  ECF No. 23 at ¶ 2.  In November of 2019, O.B.'s family moved from Ellensburg, Washington to Spokane, Washington where O.B. began his sixth grade year at Colbert Elementary School in the Mead School District ("MSD").  *Id.* at ¶¶ 3,4.  During his sixth grade year, O.B.'s teacher provided accommodations for O.B.'s ADHD without any formalized 504 plan.  *Id.* at ¶ 5.  O.B. began seeing Dr. Thomas Beck ("Dr. Beck"), a psychiatrist, who on May 13, 2020, confirmed O.B.'s previous ADHD diagnosis.  ECF No. 27 at ¶ 3.

Due to the COVID-19 pandemic, O.B. began his seventh-grade year at Mountainside Middle School attending classes virtually in the fall of 2020.  ECF No. 23 at ¶¶ 6,7.  During that time, several of O.B.'s teachers expressed concern to

O.B.'s parents about some of O.B.'s classroom struggles including lack of attentiveness, failure to turn in complete assignments, attendance issues, and a general lack of classroom engagement. *Id.* at ¶ 9. A few teachers also reported these concerns to O.B.'s school counselor, Todd Johnson ("Johnson"). *Id.* at ¶ 10.

O.B. and his family subsequently met with Dr. Beck on March 15, 2021 to address O.B.'s struggles in school. *Id.* at ¶ 11. During this appointment, in addition to O.B.'s mother reporting O.B. as highly emotional and struggling in school, O.B. expressed "occasional statements of [suicidal ideation] when frustrated but [had] no formation of intent or plan." *Id.* at ¶ 13. Dr. Beck discussed with O.B.'s family about putting a 504 plan in place and the following day faxed a letter to O.B.'s school requesting a 504 plan be implemented to accommodate O.B.'s ADHD and anxiety. *Id.* at ¶¶ 14,15. The letter included a list of potential accommodations that might be suitable with the expectation that the 504 process would identify any specific accommodations. ECF No. 27 at ¶ 5. O.B.'s mother, Karla Boe ("Mrs. Boe"), also emailed Johnson on March 18, 2021 requesting a meeting "to get [O.B.'s] 504 plan going." ECF No. 59 at ¶ 16. In response to Mrs. Boe's email, Johnson replied:

> I have two options with regards to the 504 referral process. The teachers can initiate and if they feel one is not needed, then parents can initiate the paperwork. We can even have a parent-teacher conference if that would be helpful. I will reach out to the team and once I hear back from them all, which could be a few days, I will share their input with you and go from there.

ORDER ON MOTIONS ~ 3

1  ECF No. 27 at ¶ 27.

2      Johnson thereafter reached out to O.B.'s teachers seeking any information

3  supporting a need for a 504 plan, however, none could provide any due to O.B.

4  attending classes virtually and failing to engage in class. *Id.* at ¶ 28. O.B.'s

5  parents also reached out to several of O.B.'s teachers notifying them they were

6  pursuing a 504 plan. ECF No. 22-5 at 8,28.

7      O.B. and his parents had a meeting with Johnson on March 25, 2021 where

8  Johnson provided the teacher's feedback and a decision was made to have O.B.

9  return to in-person learning and be reevaluated for the need of a 504 plan

10  thereafter. ECF No. 27 at ¶ 30. However, the parties dispute whether it was

11  Johnson or O.B.'s parents that made the decision to return O.B. to in-person

12  learning and hold off on a 504 plan. ECF Nos. 23 at ¶¶ 24,25, 33 at ¶¶ 24,25. It is

13  not disputed that Johnson also agreed to check-in with O.B. weekly once he began

14  attending in-person learning. ECF No. 27 at ¶ 31. Plaintiffs state they left the

15  March 25, 2021 meeting with an understanding Johnson would continue to follow

16  the 504-referral process while O.B. would be attending school in person, however,

17  Defendant argues the understanding was that the Boes decided to withhold

18  evaluating O.B. for a 504 plan pending his return to in-person learning. ECF Nos.

19  23 at ¶ 27, 33 at ¶ 27.

20      After the March 25 meeting, Johnson emailed O.B.'s teachers stating:

ORDER ON MOTIONS ~ 4

I met with [O.B.] and his parents today. They were easy to talk to, down to earth, and reasonable. I shared with them the concerns the team made and they were very receptive. The plan going forward is, as indicated in another email I shared as well, is to go 'in person' starting next Monday. I will check-in with [O.B.] weekly. Parents expressed that any concerns or issues that come up, to please notify them. As of now, we are holding off on the 504 and will revisit down the road as needed. Any questions please don't hesitate to reach out.

ECF No. 33 at ¶ 28.

O.B. began attending school in-person on March 29, 2021 and thereafter showed improvement in four of his five classes.  ECF Nos. 33 at ¶ 29, 27 at ¶ 36. But there are only two meetings Johnson documented having with O.B. after his in-person return: a two minute check-in on March 31, 2021 where O.B. reported no specific concerns, and a six minute meeting on May 12, 2021 discussing O.B.'s grades and getting missing assignments turned in.  ECF No. 23 at ¶ 29.  Johnson also reported a practice of stopping students in the hallways between classes to check-in without any formal documentation but could not recall if he performed these informal stops with O.B.. ECF No. 33 at ¶ 29.  Johnson left Mountainside Middle School at the end of the 2020-2021 school year.  *Id.* at ¶ 32.

On June 21, 2021, O.B.'s parents reached out to one of O.B.'s teachers, Zoe Taylor ("Taylor"), about some missing assignments and noted that they "brought in a note from [O.B.'s] doctor requesting a 504 for [O.B.] back in April."  ECF No. 33 at ¶ 30.  Taylor responded that O.B. had turned in the wrong assignments and

had been struggling the past few weeks "to get much of anything done in class" ECF No. 23 at ¶ 30.  She also noted she had not seen anything 504 related officially posted yet but would keep an eye out.  *Id.* at ¶ 31.

In the fall of 2021, O.B. began eighth grade in person and Ashley Fischer ("Fischer") was his new eighth grade counselor.  *Id.* at ¶¶ 33,34. One of O.B.'s teachers, his English teacher Ryan Henderson ("Henderson"), administered several surveys at the beginning of the year to get to know his students better, including a "Getting to Know You" survey, several check-in surveys, and an Introduction Survey.  ECF No. 22-5 at 30-72.  These included the following questions and O.B.'s answers:

- Q: "What are some of your biggest worries/anxieties about school this year?"
  A: "nothing but if I focus to hard my hand shake a lot sometimes"

- Q: "What is one academic goal you have for next week based on your answer above? Explain why you selected that goal.
  A: "to try to keep up in all my classes I just have to many im focusing on"

- Q: "What are some of your biggest worries / anxieties about school this year?
  I don't really have any just turning in my assignments I guess"

- What else you would like me to know about you?
  A: I have adhd/add

*Id.* at 35, 59, 66.

O.B. finished the fall semester with four A's, one B, and a D in his English class taught by Henderson.  O.B. stated that some of the reasons he struggled in his

ORDER ON MOTIONS ~ 6

English class were because Henderson would often sit on his phone during class rather than teach, the subject matter did not interest O.B., and one time Henderson had each student read an assignment grade aloud in front of the class. ECF No. 27 at ¶ 12-13.

On October 25, 2021, Henderson's student teacher, Maree Herron ("Herron"), emailed O.B.'s parents to let them know O.B. was great in class that day and had been very focused and attentive during a discussion on Veterans Day. *Id.* at ¶ 46. O.B.'s parents responded with

> Thank you for the email. We appreciate it. [O.B.] is supposed to have a 504 per his doctor. The doctor gave us a note for school LAST YEAR for [O.B.] to have a 504.

> He really struggles in English, especially if he has to write or talk about fiction stories. He will not engage when its non fiction so I'm not surprised that he was involved in class today to talk about Veterans Day.

> Thank you again for the email, this will help when I go to the district and ask why he doesn't have a 504 in place yet.

ECF No. 28-20 at 3.

On October 26, 2021, the Boe family met with Dr. Beck to again discuss getting a 504 plan put in place for O.B.. Plaintiffs allege that on November 17, 2021 Dr. Beck's office confirmed to Mrs. Boe that they had again faxed a letter to O.B.'s school requesting a 504 plan for O.B.. ECF No. 23 at ¶¶ 39,40. Defendant denies ever having received such letter. ECF No. 33 at ¶ 40.

ORDER ON MOTIONS ~ 7

1    On the days leading up to January 9, 2022, O.B. appeared to be in good

2 spirits and acting his usual self.  ECF no. 33 at ¶ 41.  However, on January 9, O.B.

3 returned from a sleepover at a friend's house feeling quite stressed about a paper

4 that was due the following day.  ECF No. 23 at ¶ 42.  While his parents went out to

5 grab take-out for dinner that night, O.B. went into his father's nightstand and

6 located the handgun his father kept for protection.  *Id.* at ¶ 45.  O.B. then shot

7 himself in the head.  *Id.*  The bullet missed O.B.'s brain but went through both

8 orbital cavities rendering him permanently blind in both eyes.  *Id.* at ¶ 46.

9    The parties dispute whether the shooting was accidental or a suicide attempt.

10 *Id.* Plaintiffs concede O.B. originally told law enforcement, within minutes of the

11 shooting, that it was an accident, but assert that by January 11, 2022, O.B. admitted

12 to his parents that it was actually a suicide attempt.  ECF No. 59 at ¶ 45.  O.B. was

13 treated at Sacred Heart Medical Center for his injury where he also received a

14 psychiatric assessment on January 12, 2022.  ECF No. 45-21.  The psychiatric

15 resident noted O.B. denied suicidal ideation leading up to the shooting and that

16 "[w]hile initially [O.B.] denied this being a suicide attempt, last night he did admit

17 to [his parents] that he was attempting to kill himself."  *Id.* at 4.  Further down in

18 the notes, the psychiatrist states

19    When asked what led up to the GSW incident, he stated, "I didn't take
     my med that day." He stated he had come home from his friend's
20    house, and "didn't want to do homework or go to school [the next

day]." He had had a good time at his friend's house and denied any other specific trigger.

He denied having suicidal thoughts leadings up to the shooting. When asked if he had thoughts of not wanting to be alive, he responded, "a little bit." He reported feeling this way, about every other day, since the start of the COVID pandemic. He denied having a specific plan or intent to kill himself prior to this incident. He denied any prior suicide attempts or self-harm behavior. When directly asked about his comment to his parents last night that this was a suicide attempt, he shrugged and responded, "sort of." To most questions about what specifically happened (with the gun) and why, he responded, "I don't know." He added, "I thought there was no bullet in the chamber," and stated that he was "just looking at it," and that he kept his finger "above the trigger." Looking back, his main thought is "not to do it again."

*Id.* at 4.

Following this assessment, the attending psychiatric physician wrote up an attestation on January 13, 2025 agreeing with the overall assessment and care plan and made a concluding statement

Per patient, recent dysphoria primarily related to school making him do everything through a screen and refusing his request for paper assignments in addition to his perception an English teacher was not listening to his concerns. Reportedly, school refused 504 plan accommodations requested by patient, family, and R. Beck. Suicide attempt temporally correlated to missed medication dose, sleep deprivation, and facing an assignment without accommodation.

*Id.* at 2.

O.B. is currently enrolled at the Washington State School for the Blind ("WSSB") in Vancouver, Washington where he receives accommodations both for his blindness and his ADHD. ECF No. 23 at ¶ 49.

ORDER ON MOTIONS ~ 9

1      Mead School District's 504 Plan Procedural Process

2          The parties agree on the following as to MSD's 504 procedural process.  The

3      decision-making process to determine whether a student qualifies for a 504 plan

4      involves consideration of all available information including outside information

5      provided by parents, and identifying the eligibility category that best expresses the

6      student's needs.  ECF No. 23 at ¶ 52.  Attention may be brought to a student who

7      would benefit from a 504 plan through a comprehensive child find process.  *Id.* at ¶

8      53.  The process permits referrals from a number of sources including parents,

9      teachers, school administrators, or any outside source that notice a student

10     struggling and believe accommodations would be beneficial.  *Id.* at ¶¶ 54,55.

11     These sources may fill out a specific referral form to initiate the eligibility process

12     or simply express concern with the district and the district will then fill out the

13     form as part of the process.  *Id.* at ¶¶ 57-59.  There is no "magic language" a

14     referrer must use to trigger special education eligibility identification process.  *Id.*

15     at ¶60.

16         After a student is referred for a 504 plan, the district must get the parents'

17     consent for an evaluation, provide notice of the parents' rights, and conduct the

18     evaluation.  ECF No. 23 at ¶ 63.  After the evaluation, the 504 case manager calls a

19     team meeting with parents to go over the eligibility determination.  *Id.* at ¶ 64.  If

20     the student is found eligible for a 504 plan, the team would discuss the specific

accommodations needed and the case manager would write up the 504 plan. *Id.* at ¶¶ 65,66.

The Court will now address each motion in turn.

## II. MOTION TO AMEND

Defendant moves to amend an answer it provided to Plaintiffs' Request for Admission ("RFA") No. 2 back on May 23, 2024. ECF No. 62. The RFA in question and Defendant's original response was as follows:

2.    Admit that Mead School District received the November 17, 2021 fax from Dr. Thomas Beck at the Winston Center regarding O.B.'s ADHD diagnosis and recommended accommodations.

**RESPONSE:**

**Mead SD admits that it received a letter from Thomas Beck at the Winston Center dated November 17, 2021.**

ECF No. 22-14 at ¶ 2.

Defendant now asserts that the provided answer was a good-faith mistake based on the confusion of MSD's superintendent who assisted Defendant's counsel in responding to RFA No. 2. ECF No. 62 at 2. Defendant's new position is that MSD never received the letter allegedly faxed on November 17, 2021. *Id.* at 3. Plaintiffs strongly oppose Defendant's motion and argue that permitting Defendant to amend the RFA will prejudice Plaintiffs. ECF No. 80 at 5.

Pursuant to Fed. R. Civ. P. 36(b), "[t]wo requirements . . . must be met before an admission may be withdrawn: (1) presentation of the merits of the action must be subserved, and (2) the party who obtained the admission must not be prejudiced by the withdrawal." *Hadley v. United States*, 45 F.3d 1345, 1348 (9th Cir. 1995). "The party who obtained the admission has the burden of proving that withdrawal of the admission would prejudice the party's case." *Id.* However, even "when a district court finds that the merits of the action will be subserved and the nonmoving party will not be prejudiced, it 'may' allow withdrawal, but is not required to do so under the text of Rule 36(b)." *Conlon v. United States*, 474 F.3d 616, 625 (9th Cir. 2007).

The first prong of a Rule 36(b) analysis is satisfied "when upholding the admissions would practically eliminate any presentation of the merits of the case." *Hadley*, 45 F.3d at 1348. Defendant argues presentation of the merits will be subserved if it is not permitted to amend its RFA No. 2 answer because it goes to Plaintiffs' argument that Defendant acted with deliberate indifference by failing to respond to the letter. ECF No. 62 at 5. Plaintiffs respond that the admission does not eliminate any presentation of the merits of the case because Defendant continued to argue it complied with Section 504 even after admitting it received the letter, and both sides will still argue if the failure to respond to the letter was the proximate cause of O.B.'s suicide attempt. ECF No. 80 at 7. Further, Plaintiffs

contend Defendant can still argue the suicide attempt was not actually a suicide attempt or that O.B. was not suffering from school related despair when he shot himself.  *Id.*

      "A plaintiff bringing suit under § 504 must show (1) he is an individual with a disability; (2) he is otherwise qualified to receive the benefit; (3) he was denied the benefits of the program solely by reason of his disability; and (4) the program receives federal financial assistance." *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1136 (9th Cir. 2001), *as amended on denial of reh'g* (Oct. 11, 2001).  To recover damages under the ADA or Rehabilitation Act, the plaintiff must prove intentional discrimination or deliberate indifference.  *Id.* at 1138.  "Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." *Id.* at 1139.  "When the plaintiff has alerted the public entity to his need for accommodation . . . the public entity is on notice that an accommodation is required, and the plaintiff has satisfied the first element of the deliberate indifference test." *Id.*  Upholding Defendant's admission that it received the November 17, 2021 letter will give Plaintiffs a strong argument for deliberate indifference because it provided the requisite notice to Defendant and Defendant never responded.  Therefore, the admission goes to the merits of at least one of Plaintiffs' claims. *See, e.g.*, *Weil v. Walmart Inc.*, 644 F. Supp. 3d 772, 778 (D. Nev. 2022) ("Weil concedes that withdrawal would promote

presentation of the merits—indeed, the admissions go to the heart of Weil's claim for negligence.").

Plaintiffs bear the burden of showing they will suffer prejudice if Defendant is permitted to amend the RFA. Plaintiffs have not met that burden here. Plaintiffs assert that "every strategic decision since May 22, 2024 has been premised on the undisputed fact that the school received the psychiatrist's letter in November 2021" yet do not identify how their strategy would have been different absent the admission. ECF No. 80 at 9. "When undertaking a prejudice inquiry under Rule 36(b), district courts should focus on the prejudice that the nonmoving party would suffer at trial." *Conlon*, 474 F.3d at 623. Plaintiffs do not specify how they would suffer at trial other than a general assertion that their case was built upon this undisputed fact. They do not identify what additional discovery would have been sought or how a withdrawn admission would create a "sudden need" to gather evidence or whether the trial would need to be continued in the event that the admission is amended. In fact, Plaintiffs appear to have evidence they can present at trial to support their allegation that MSD did receive the November 17 letter including the testimony of Riley Thomas who allegedly faxed the letter to MSD, Karla Boe's testimony that she was told by Dr. Beck's office that the letter had been faxed to MSD, and the prior deposition testimony of Josh Westermann and Kellie Timberlake. Plaintiffs argue that with the admission they focused their

resources on other areas of the case but again do not specify how they would have proceeded differently absent the admission.

Therefore the Court concludes permitting Defendant to withdraw its admission would promote presentation of the case on its merits without prejudicing Plaintiff.  Defendant's Motion to Amend answer to RFA No. 2 (ECF No. 62) is **granted**.

### III.    MOTIONS TO STRIKE

**A. Defendant's Motion to Strike Declaration of Jennifer Hervey-Langley**

Defendant moves to strike Plaintiff's submitted declaration Jennifer Hervey-Langley's ("Hervey-Langley") in opposition of Defendant's motion for partial summary judgment and preclude her from testifying at trial.  ECF No. 51.

Defendant contends Hervey-Langley's identity was not timely disclosed pursuant to the set scheduling order.  The discovery cutoff date was set for December 30, 2024 (ECF No. 13), and the parties were required to disclose experts by November 21, 2024 and rebuttal experts by January 3, 2025.  ECF No. 15. According to Defendant, Hervey-Langley was not disclosed as a witness until January 3, 2025 and appears to be offering both lay witness and expert opinion testimony.  ECF No. 51 at 2.

Defendant argues Hervey-Langley should have been disclosed as a lay witness in the initial disclosures or at least identified in response to Defendant's

1   interrogatory seeking information on anyone who had knowledge of the facts and

2   circumstances of the case. *Id.* at 4. Defendant therefore requests all lay testimony

3   of Hervey-Langley be stricken from her declaration. Similarly, Defendant

4   contends any expert testimony should also be stricken due to Plaintiffs failing to

5   disclose Hervey-Langley as an expert by the November 21, 2024 deadline. *Id.* at

6   6-7.

7          Rule 26(a)(1)(A)(i) requires a party to disclose "the name and, if known, the

8   address and telephone number of each individual likely to have discoverable

9   information . . . that the disclosing party may use to support its claims or defenses."

10  If "a party fails to provide information or identify a witness as required by Rule

11  26(a) . . . the party is not allowed to use that information or witness to supply

12  evidence . . . at trial, unless the failure was substantially justified or is harmless."

13  Fed. R. Civ. P. 37(c)(1). The burden to prove harmlessness or that the violation

14  was substantially justified lays with the party facing sanctions for the delayed

15  disclosure. *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107

16  (9th Cir. 2001).

17         As to Hervey-Langley's lay witness testimony, Plaintiffs do not contend that

18  they failed to include her in their initial and supplemental disclosures and make no

19  argument they were substantially justified in the late disclosure. Instead, they

20  assert that it was harmless. First, Plaintiffs argue that Defendant was not

prejudiced by the late disclosure because it was aware of Hervey-Langley's involvement months prior when they produced records for their second supplemental disclosure identifying Hervey-Langley as O.B.'s case manager and primary contact.  ECF Nos. 67 at 7-8, 68 at 2-3.  The Court disagrees.  Supplying Defendant nearly 60 pages of records from the Washington School for the Blind that intermittently mention Jennifer Langley along with several other staff members did not give sufficient notice to Defendant that Plaintiffs might call Hervey-Langley as a witness.  And by Plaintiffs' own argument, if Defendant should have been aware that Hervey-Langley was a potential witness *months* in advance, so too should have Plaintiffs, yet they failed to make any proper disclosure when they had ample time to do so.

Second, Plaintiffs argue the delay was harmless because even if they had disclosed Hervey-Langley as a lay witness by the December 30, 2024 discovery deadline, Defendant would be in the same position it is in now.  ECF No. 67 at 7-8.  This argument is likewise unavailing.  Even if Plaintiffs had made the disclosure by the discovery cutoff deadline three days prior, Defendant would still not have been able to depose Hervey-Langley before the deadline.  Thus Plaintiff's disclosure would still have been untimely.  *See, e.g.*, *Lopez v. Lopez*, No. CV 18-6473-MWF-MAA, 2020 WL 2043996, at *6 (C.D. Cal. Jan. 23, 2020) ("Plaintiff waited to disclose a key witness until the day prior to fact discovery closing,

leaving Defendants with little ability to react.  This type of conduct is expressly foreclosed by the Federal Rules of Evidence.").

Next, Plaintiffs' claim the delay was harmless because  once they disclosed Hervey-Langley as a witness to Defendant on January 3, 2025, and Defendant objected, Plaintiffs immediately offered to move the Court to allow the deposition after the discovery deadline but Defendant did not express an interest "and instead seeks to weaponize the three-day delay." ECF No. 67 at 8.  Defendant counters that counsel for Defendant addressed the matter specifically with Plaintiffs' counsel and told her Plaintiffs were the ones that needed to seek relief from the Court for their late disclosure.  ECF No. 69 at 8.  However, they never did and simply waited to file the declaration 18 days later with their response to Defendant's motion for summary judgment.  *Id.*

The Court agrees that Defendant's failure to take up Plaintiffs' offer to request permission from the Court to depose Hervey-Langley after the discovery deadline does not render Plaintiffs' error harmless.  All dispositive and *Daubert* motions were due by January 6, 2025, witness and exhibit lists by February 18, 2025,  motions *in limine* by February 25, and objections by March 4.  Granting extra time for Defendant to depose Hervey-Langley who was only first disclosed on January 3 would have required the Court push back all these deadlines and most likely the trial date itself.  Therefore, the Court concludes Plaintiffs have not shown

1    the late disclosure to be substantially justified or harmless.  Hervey-Langley will

2    not be permitted to give lay witness testimony.

3           As for expert testimony, Plaintiffs argue that Hervey-Langley was timely

4    disclosed as a rebuttal expert witness.  ECF No. 67 at 8.  Plaintiffs seek to use

5    Hervey-Langley's testimony to rebut Defendant's expert, Dr. Cinda Johnson's

6    ("Dr. Johnson") testimony.  *Id.* at 8-9.  Defendant argues that Plaintiffs identifying

7    Hervey-Langley as a rebuttal expert is just an alternative attempt to excuse her late

8    disclosure and that Plaintiffs have not complied with Federal Rule of Civil

9    Procedure 26(a)(2)(B).  ECF No. 69 at 6.  Further, Defendant contends that there is

10   no evidence that Plaintiffs even submitted Dr. Johnson's report to Hervey-Langley.

11          Rebuttal witness testimony is proper where it addresses the same subject

12   matter as the initial expert without introducing any novel arguments.  *See*

13   *Laflamme v. Safeway, Inc.*, No. 3:09-CV-00514, 2010 WL 3522378, at *3 (D. Nev.

14   Sept. 2, 2010) ("As long as defendant's rebuttal expert witnesses speak to the same

15   subject matter the initial experts addressed and do not introduce novel arguments,

16   their testimony is proper under Federal Rule of Civil Procedure 26(a)(2)(C) and

17   related case law from District Courts in this circuit.").

18          After reviewing Dr. Johnson's report and Hervey-Langley's declaration, the

19   Court finds some potential overlap on the subject matter.  Specifically whether

20   accommodations for O.B.'s ADHD would have assisted him in his classes.  In Dr.

ORDER ON MOTIONS ~ 19

Johnson's report, she lists the recommended accommodations made in Dr. Beck's

letter including

- quiet and low-distraction environment
-  extended time to complete tests
- checklists or graphic reminders
- graphic organizers
- tasks broken down into small steps
- provide class notes and written assignment list
- chunk instructions into smaller pieces.

ECF No. 68-3 at 7.

Dr. Johnson concluded that "[t]here is not indication that these [ADHD]

accommodations would assist [O.B.] in his classes." *Id.*  However, in Hervey-

Langley's declaration, she states

> Knowing what I know about O.B. now having worked with him at
> WSSB, drawing upon my decades of special education experience, and
> based on O.B.'s records that I have reviewed from prior to his vision
> loss in January 2022, it seems clear to me that O.B. is a student who
> would have greatly benefitted from the recommendations that Dr. Beck
> made back in May 2020 up until he finally got an IEP. Specifically, I
> expect O.B. would have benefitted from: Extra time to complete his
> assignments; Accommodations to assist with working memory like
> graphic organizers, word banks, and stepped instructions; Tasks broken
> down and completed in individual steps to help with the overwhelm
> that comes with bigger assignments; Providing class notes and
> assignment lists; and Chunking instruction into small pieces.

ECF No. 50 at ¶ 13.

Despite the overlap, it is not apparent that Hervey-Langley developed her

declaration for the purpose of rebutting Dr. Johnson's report or that she was even

ORDER ON MOTIONS ~ 20

aware of the report.  Moreover, it is not a report that complies with FRCP 26(a)(2)(B).  Despite Defendant pointing out Plaintiffs' failure to comply with the FRCP, Plaintiffs do not acknowledge the failure or any attempt to remedy it in their response.  This indicates to the Court that Plaintiffs' designation of Hervey-Langley as a rebuttal expert is just an attempt to excuse a late disclosure. Therefore, the Court concludes Hervey-Langley is not a proper rebuttal expert and her declaration is stricken from the record.  She will not be permitted to testify at trial.

Plaintiffs make an additional argument that if Hervey-Langley is not permitted to testify, the Court should nevertheless consider her declaration in support of Plaintiffs' response to Defendant's motion for summary judgment and their reply in support of Plaintiffs' motion for summary judgment.  ECF No. 67 at 6-7.  Plaintiffs cite to *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) in support of their assertion that "the nonmoving party need not present evidence in a form necessary for admission at trial."  ECF No. 67 at 7.  The Court may consider the facts underlying the declaration if they can be presented in admissible form at trial even if the declaration is not itself admissible.  *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents.").

1        Plaintiffs point to the fact Hervey-Langley's declaration is based on records

2   from WSSB that were properly provided to Defendant and "the WSSB social

3   worker was expressly named in Plaintiffs' initial disclosure on March 1, 2024." *Id.*

4   Yet Plaintiffs do not provide any sort of explanation or argument of how this

5   unnamed social worker can testify to the information in Hervey-Langley's

6   declaration or the underlying records supporting it.  Much of Hervey-Langley's

7   declaration relates to her personal knowledge working with O.B. and her expertise

8   in her in role at WSSB.  ECF No. 50.  She makes some statements indicating group

9   discourse and agreement such as "[a]fter reading his IEP sent from MEAD school

10  district, *we* made modifications to his IEP and accommodations", or "[t]he WSSB

11  staff were in agreement that ADHD actually more significantly impacted O.B.'s

12  academic success that his loss of vision did", or "[w]e at WSSB believe that

13  providing appropriate ADHD accommodations to best support the student in

14  demonstrating his skills has allowed O.B. to show his true academic ability." *Id.*

15  But Plaintiffs do not make any showing of how this social worker was a part of

16  these group decisions and can attest to them.

17        Therefore, the Court **grants** Defendant's motion to strike Hervey-Langley's

18  declaration and will not take it into consideration for summary judgment purposes.

19  **B. Plaintiffs' Motion to Strike (ECF No. 53)**

20        Plaintiffs move to strike the declarations of Josh Westermann, Kellie

Timberlake, Jared Hoadley, and Todd Johnson (ECF No. 53). Plaintiffs argue the declarations of Josh Westermann ("Westermann") and Kellie Timberlake ("Timberlake") are sham affidavits because they directly contradict their prior deposition testimony confirming MSD received Dr. Beck's November 17, 2021 letter. *Id.* at 7-11. Defendant seeks to use these affidavits to create a genuine issue of fact as to whether MSD received the November 17 letter.

"The sham affidavit rule prevents 'a party who has been examined at length on deposition' from 'rais[ing] an issue of fact simply by submitting an affidavit contradicting his own prior testimony,' which 'would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.' " *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) (quoting *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991)). "In order to trigger the sham affidavit rule, the district court must make a factual determination that the contradiction is a sham, and the 'inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit.' " *Id.* (quoting *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998-99 (9th Cir. 2009)).

After reviewing both the deposition testimony of Westermann and Timberlake and their declarations, the Court concludes the consistency is not so clear and unambiguous as to trigger the sham affidavit rule. During Westermann's

deposition, Westermann stated he "saw there was a second letter from Dr. Beck." ECF No. 48-1 at 3.  And during Timberlake's deposition, Timberlake stated "I did see that was sent, yes" in response to Plaintiffs' counsel asking if it was her understanding that Dr. Beck sent another letter in November 2021.  *Id.* at 4. However neither Westermann or Timberlake were further questioned on the letter's existence or how they knew of it.

Westermann and Timberlake's declarations (ECF Nos. 36, 37) do not deny the existence of the letter, only that they did not physically see it or receive confirmation that the letter was received by MSD but rather operated under the assumption it was received after reviewing MSD's admission to RFA No. 2.  The Court cannot conclude the declarations so flatly contradict the prior deposition testimony as to be a sham.  *See Messick v. Horizon Indus.*, 62 F.3d 1227, 1231 (9th Cir. 1995) ("[T]he non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition . . . .").

As for Hoadley's declaration, Plaintiffs argue it attempts to create a genuine issue of fact where there is none due to conclusive admission in RFA No. 21.  ECF No. 53 at 6-7.  As previously discussed, the Court will permit Defendant to amend its answer to RFA No. 2, therefore, an issue of fact now exists whether MSD did receive the November 17 letter.  Hoadley's declaration is permitted.

1    For these reasons, the Court **denies** Plaintiffs' request to strike the

2    declarations of Westermann, Timberlake, and Hoadley.

3    Finally Plaintiffs argue that Todd Johnson's affidavit should be stricken as

4    contradictory to his deposition testimony.  ECF No. 53 at 9.  Plaintiffs argue that

5    during Johnson's deposition testimony, he was unable to recall a number of things

6    that his affidavit (ECF No. 34) now recalls with "unbelievable clarity" such as his

7    interactions with O.B. and his parents and MSD's 504 process.  ECF No. 53 at 8-

8    11.

9    The sham affidavit rule may apply in situations where it contains facts that

10   the affiant had previously testified to not recalling.  *Yeager*, 693 F.3d at 1080

11   ("The district court could reasonably conclude that no juror would believe

12   Yeager's weak explanation for his sudden ability to remember the answers to

13   important questions about the critical issues of his lawsuit.").  But after reviewing

14   Johnson's deposition testimony and his affidavit, the Court cannot conclude that

15   the inconsistency is so clear and unambiguous as to justify striking it.  During

16   Johnson's deposition, he was unable to recall a lot of specific details of his

17   interactions with O.B. and his parents from memory, but knew such interactions

18   occurred largely from documented evidence such as emails and his own notes.

19   ECF No. 54-3.  Johnson's affidavit similarly relies on these documented

20   interactions and repeats what was said in email exchanges and his own notes.

1    Plaintiffs point to Johnson's assertion in his affidavit that he "may" have had

2    frequent check ins with O.B. "given that he and his teachers were not reporting any

3    struggles after he returned" as contradictory to his deposition testimony.  ECF No.

4    53 at 10.  But Johnson very clearly in the affidavit states "I do not have a specific

5    memory of stopping O.B. in the hallway for an informal check-in."  ECF No. 34 at

6    11.  This aligns with his deposition testimony that it was not uncommon for him to

7    stop students in the hallway but, "I don't know if I did this or not."  ECF No. 54-3

8    at 11.

9    The Court does not find that Plaintiffs' other examples of inconsistencies

10   present clear contradictions.  The only assertion in the affidavit the Court finds

11   somewhat inconsistent is what occurred at the March 25, 2021 meeting between

12   Johnson and the Boes.  Johnson's affidavit states that during the meeting, it was

13   the Boes' decision to return O.B. to in person learning and hold off on a 504 plan.

14   ECF No. 34 at 7.  Whereas Johnson's deposition testimony states that he did not

15   recall specifics of the conversation during the meeting but "suspected" it would

16   have been the parents' decision to hold off on a 504.  ECF No. 54-3.  But despite

17   some variance, the statements are not completely contradictory.  Moreover, the fact

18   of who made the decision to hold off on a 504 plan has been disputed the entire

19   case.

20

In any case, Plaintiffs will have the opportunity to question Johnson about any inconsistencies or discrepancies at trial. Therefore, the Court finds Johnsons' affidavit is not a shame affidavit and Plaintiffs' motion to strike it is **denied**.

For these reasons, Plaintiffs request for fees and costs related to this motion is also **denied**.

## IV.    EXPERT TESTIMONY

Defendant moves to exclude the testimony of Plaintiffs' disclosed expert, Amy Klosterman ("Klosterman), as improper expert testimony. ECF No. 24.

### A. Applicable Law

Admission of expert witness testimony is governed by Rule 702, which provides in relevant part:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

Fed. R. Evid. 702.

In evaluating whether the proffered expert testimony will facilitate the trier of fact's understanding of the evidence or determination of a fact in issue under Rule 702, the Court assesses both the relevance and reliability of the testimony. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-92 (1993). Evidence is

relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401; *see also* Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").  However, in general, "an expert cannot testify to a matter of law amounting to a legal conclusion."  *United States v. Tamman*, 782 F.3d 543, 552 (9th Cir. 2015).  "Resolving doubtful questions of law is the distinct and exclusive province of the trial judge."  *United States v. Brodie*, 858 F.2d 492, 496 (9th Cir. 1988).  The Court possesses "broad latitude" to determine the admissibility of expert testimony, subject only to abuse of discretion review on appeal, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997)).

As made clear by a recent amendment to Rule 702 in December 2023, the burden rests with the proponent of the expert testimony to demonstrate by a preponderance of the evidence that the testimony is admissible.  *See* Fed. R. Evid. 702 Advisory Committee Note (2023).

**B. Analysis**

In Defendant's motion to exclude the testimony of Klosterman, Defendant contends that Klosterman's report is improper because it consists of legal conclusions regarding Defendant's alleged failure to comply with Section 504. ECF No. 24.  Plaintiffs argues Klosterman is an expert witness that will provide

testimony on the process and procedures of Section 504.  ECF No. 29 at 6.

Plaintiffs assert that Klosterman's opinion is a result of a factual analysis on

"[w]hether the District's policies comport to Federal regulations and whether the

actions of the District's staff and administration conformed to both the District's

own policies and the overarching Federal regulations when it made decisions

regarding O.B. . . . ."  ECF No. 29 at 6-7.  Plaintiffs contend these are not improper

legal conclusion because Klosterman did not opine on whether Defendant's

failures rise to the level of "deliberate indifference."  *Id.* at 7.

In reviewing Klosterman's report, the Court finds she provides numerous

legal conclusions.  First, Klosterman summarizes her opinion at the beginning of

the report

> It is my professional opinion . . . that if OCR [Office of Civil Rights] were to review the Boes' allegations, OCR would determine that the district violated Section 504 when it failed in its obligation to provide O.B. with a free appropriate public education, based on its failure to comply with Section 504's requirements in the following areas:
>
> 1. The district failed to identify, locate, and timely conduct an evaluation of O.B. as a student who needs or is believed to need special education or related services because of a disability (34 C.F.R. 104.32, 34 C.F.R. 104.35(a)).
> 2. The district failed to provide Karla and Gabriel Boe with notice of their procedural safeguards under Section 504, including how to appeal the district's refusal to evaluate O.B., prior to March 2022 (34 C.F.R. 104.36).

ECF No. 25-1 at 5.

ORDER ON MOTIONS ~ 29

Klosterman goes on to interpret the meaning of Section 504 and its regulations throughout the opinion.  In fact, several pages of the report exclusively discuss OCR's interpretation and application of Section 504 and the duties and obligations it creates for school districts.  *Id.* at 5-7.  Klosterman then spends the rest of the report explaining how Defendant failed to meet these duties and obligations or simply misinterpreted them.  ECF No. 25-1 at 5-22.  For example, she states, "Mr. Johnson's email to the Boes presented an incorrect and misleading description of the 504 referral process.  As noted above, the first step in an evaluation process is to determine if the student has a disability."  ECF No. 25-1 at 9.  Similarly, later in the report, Klosterman states, "Under Section 504, it is not completely up to teachers to determine potential accommodations, or to decide whether those would benefit a student.  Those decisions should be made as part of an appropriate evaluation process involving a variety of sources of information.  Such an evaluation did not occur."  *Id.* at 10.  Klosterman makes several other similar assertions all throughout the report.  Testimony of this sort that would instruct the jury as to the applicable law, and how the facts apply to the law, constitutes an opinion of an ultimate issue of law.  *Hangar v. Provident Life & Accidents Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004).

Plaintiffs' argument that Klosterman's testimony is admissible because she does not opine on whether Defendant's actions rose to deliberate indifference "but

1    instead focused on the District's factual noncompliance with 504 process and

2    procedure" is unavailing.  Klosterman is still asserting her interpretation of the

3    Section 504 process and procedure and how it applies to Defendant's actions.

4    Many courts have found such testimony of legal interpretation to be inadmissible.

5    *See, e.g.*, *McHugh v. United Serv. Auto. Ass'n*, 164 F.3d 451, 454 (9th Cir. 1999)

6    ("Although experts may disagree in their conclusions, their testimony cannot be

7    used to provide legal meaning or interpret ... policies as written."); *Antrim Pharms.*

8    *LLC v. Bio-Pharm, Inc.*, 950 F.3d 423, 430 (7th Cir. 2020) ("Experts generally

9    must not testify on pure issues of law, such as the meaning of statutes or

10    regulations.");  *United States ex rel. Miller v. ManPow, LLC*, No.

11    221CV05418VAPADSX, 2023 WL 9005796, at *10 (C.D. Cal. Nov. 22, 2023)

12    ("The Court declines to follow Defendant's cited authority to admit Gray's

13    otherwise impermissible statutory and regulatory interpretations.").

14        Plaintiff next argues that Klosterman's testimony regarding disability

15    procedural obligations under Section 504 is admissible because it would help the

16    jury understand a complex regulatory framework.  ECF No. 29 at 8-9.  In support,

17    Plaintiff cites to *Flores v. Arizona*, 516 F.3d 1140, 1166 (9th Cir. 2008), *reversed*

18    *on other grounds by Horne v. Flores*, 557 U.S. 433 (2009).  In *Flores*, the Ninth

19    Circuit affirmed a district court's decision to admit expert testimony on federal

20    educational funding law.  In doing so the court explained that while expert

testimony on matters of law are generally inappropriate, "there may be 'instances in rare, highly complex and technical matters where a trial judge, utilizing limited and controlled mechanisms, and as matter of trial management, permits some testimony seemingly at variance with the general rule.' " *Id.* at 1166 (quoting *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 101 (1st Cir. 1997)). But the court also noted that because the case had been a bench trial, "there was no danger that a jury might give too much credence to a legal expert." *Id.* Indeed, other courts have been more lenient in permitting legal expert testimony where it was meant to aid the court rather than a jury. *See Marshall v. Northrop Grunman Corp.,* No. 2:16-CV-06794-AB-JCX, 2019 WL 6354373, at *2 (C.D. Cal. Oct. 16, 2019) ("Because this bench trial will largely concern Defendants' fiduciary obligations under ERISA, the Court finds that Witz's testimony may well be useful. Further, Witz's testimony as to fiduciary obligations under ERISA, prohibited transactions, and the interpretation of the Administrative Services Agreement is not prejudicial, as there is 'no danger that a jury might give too much credence to a legal expert.'"); *Walsh v. Reliance Tr. Co.*, No. CV-19-03178-PHX-ROS, 2023 WL 1966921, at *7 (D. Ariz. Feb. 13, 2023) ("[T]he Ninth Circuit has noted expert testimony on 'matters of law' might be permissible in some bench trials because there is 'no danger that a jury might give too much credence to a legal expert.'").

In this case, it is not apparent to the Court that the legal framework of Section 504 is so highly technical and complex as to warrant legal testimony that outweighs any prejudicial effect on the jury. Nor does Plaintiff identify any case demonstrating that the Section 504 statutes and regulations are so complex as to warrant expert testimony interpreting their meaning. Further, much of Klosterman's explanation of Section 504 is simply a recitation of what the regulations say.

For example, the report states, "A district must evaluate a student who needs or is believed to need special education or related services before taking any action with respect to the initial placement of a student in regular or special education, or denial of placement, and before making any subsequent significant changes in placement." ECF No. 25-1 at 6. The cited regulation, 34 C.F.R. § 104.35, states,

> A recipient that operates a public elementary or secondary education program or activity shall conduct an evaluation in accordance with the requirements of paragraph (b) of this section of any person who, because of handicap, needs or is believed to need special education or related services before taking any action with respect to the initial placement of the person in regular or special education and any subsequent significant change in placement.

The report states, "Under Section 504, a person with a disability is one who meets any of the following criteria:

- Has a physical or mental impairment that substantially limits one or more major life activities;
- Has a record of such an impairment, or

ORDER ON MOTIONS ~ 33

- Is regarded as having such an impairment."

ECF No. 25-1 at 6.

The cited regulation, 34 C.F.R. § 103(j) states,

> (j) ***Handicapped person*** —
>
> > (1) ***Handicapped persons*** means any person who
> >
> > > (i) has a physical or mental impairment which substantially limits one or more major life activities,
> > >
> > > (ii) has a record of such an impairment, or
> > >
> > > (iii) is regarded as having such an impairment.

The report states,

> In interpreting evaluation data and making placement decisions, including the decision not to provide a student with a 504 plan, a district must "draw upon information from a wide variety of sources" including testing, teacher recommendations, and adaptive behavior; must have procedures to make sure that all such information is document and considered; and the placement decision must be made by a group of persons, including those knowledgeable about the student.

ECF No. 25-1 at 6.

The cited regulation, 34 C.F.R. § 104.35 states,

> (c) ***Placement procedures.*** In interpreting evaluation data and in making placement decisions, a recipient shall
>
> > (1) draw upon information from a variety of sources, including aptitude and achievement tests, teacher recommendations, physical condition, social or cultural background, and adaptive behavior,
> >
> > (2) establish procedures to ensure that information obtained from all such sources is documented and carefully considered,
> >
> > (3) ensure that the placement decision is made by a group of persons, including persons knowledgeable about the child, the meaning of the evaluation data, and the placement options, and

ORDER ON MOTIONS ~ 34

(4) ensure that the placement decision is made in conformity with [§ 104.34](#).

The only supplemental information Klosterman incorporates into her report is discussion of the OCR's 2016 Dear Colleague Letter and Resource Guide on Students with ADHD which is a summary of the civil rights requirements of Section 504 as set out in its implementing regulations. [1]  The Court finds again this report to not be overly complex or technical.  ECF No. 25-1 at 6.  Moreover, the Dear Colleague Letters are not binding law but rather serve as a guide to local educational agencies.

Plaintiffs lastly argue that if the Court concludes some of the testimony to be improper, it should narrow the scope of the testimony rather than exclude it altogether.  ECF No. 29 at 13.  But Plaintiffs fail to identify what other testimony Klosterman could provide that would be admissible.  Therefore, Defendant's motion to exclude the testimony of Amy Klosterman (ECF No. 24) is **granted**.

## V.   MOTIONS FOR SUMMARY JUDGMENT

Each party moves for partial summary judgment (ECF Nos. 21, 26).  Plaintiffs move for summary judgment as to their second cause of action, Disability-based discrimination in violation of Section 504 of the Rehabilitation

---

[1] [http://www.ed.gov/sites/ed/files/about/offices/list/ocr/letters/colleague-201607-504-adhd.pdf](http://www.ed.gov/sites/ed/files/about/offices/list/ocr/letters/colleague-201607-504-adhd.pdf)

Act of 1973, 29 U.S.C. § 794, and the first two elements of their third cause of action alleging negligence, i.e., duty and breach of duty.  Defendant moves for summary judgment as to Plaintiffs' federal causes of action under the Rehabilitation Act and Americans with Disabilities Act ("ADA").

**A. Summary Judgment Standard**

The Court may grant summary judgment in favor of a moving party who demonstrates "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the court must only consider admissible evidence.  *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002).  The party moving for summary judgment bears the initial burden of showing the absence of any genuine issues of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the non-moving party to identify specific facts showing there is a genuine issue of material fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id*. at 252.

For purposes of summary judgment, a fact is "material" if it might affect the outcome of the suit under the governing law.  *Id*. at 248.  Further, a dispute is "genuine" only where the evidence is such that a reasonable jury could find in favor

of the non-moving party.  *Id.*  The Court views the facts, and all rational inferences therefrom, in the light most favorable to the non-moving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  Summary judgment will thus be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

**B. Federal Law Claims**

Plaintiffs bring disability-based discrimination claims both pursuant to Title II of the ADA (42 U.S.C. § 12132) and Section 504 of the Rehabilitation Act (20 U.S.C. § 794).  To state a claim for a violation of Title II, "a plaintiff must show: (1) he is a 'qualified individual with a disability'; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reasons of his disability." *Duvall v. Cnty of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001).  A claim under Section 504 of the Rehabilitation Act must meet the same elements but in addition the plaintiff must prove that "the program receives federal financial assistance." *Id.*  To recover monetary damages under Title II of the ADA or Section 504 of the Rehabilitation Act, the plaintiff must show intentional discrimination or deliberate indifference.  *Id.* at 1138.

In Plaintiffs' motion for partial summary judgment, they move for summary judgment as to the Section 504 claim.  Plaintiffs argue that O.B. was disabled as defined under Section 504, Defendant failed to provide O.B. the benefits he was entitled to under law by refusing to initiate the 504 process, Defendant's failure to follow Section 504 amounted to discrimination against O.B. on the basis of his disability, and the discrimination rose to the level of deliberate indifference.  ECF No. 21.

Defendant disputes Plaintiffs' assertions that it refused to provide O.B. accommodations and that it was deliberately indifferent.  ECF Nos. 32 at 15, 17. Further, Defendant argues in its summary judgment motion that Plaintiffs cannot show any deliberate indifference which make their federal claims fail as a matter of law.  ECF No. 26.  The Court finds issues of material fact exist as to whether Defendant's actions constituted as a violation of Section 504 and rose to the level of deliberate indifference.

### 1. MSD's refusal of accommodations

Plaintiffs argue Defendant refused to evaluate O.B. for a 504 plan which he undoubtedly qualified for due to his disability.  ECF No. 21 at 17.   Defendant counters that MSD never refused to evaluate O.B. because Plaintiffs agreed in the meeting with Johnson on March 25, 2021 to hold off on a 504 plan evaluation, and never renewed the request thereafter.  ECF No. 32 at 15.  However, Plaintiffs

contend it was Johnson who told them he did not believe O.B. needed a 504 plan and advised them that O.B. should return to school in person and that Johnson would check in with him once a week to determine if a 504 plan was needed. ECF No. 21 at 8.

The email Johnson sent out to O.B.'s teachers after his meeting with O.B.'s parents supports a finding that the decision to hold off on the 504 plan was at least mutually agreed upon by both parties. However, Karla Boe's emails to O.B.'s English teacher and student teacher in June 2021 and October 2021 mentioning a request for 504 plan had been made support Plaintiffs' contention that they left the meeting with Johnson believing O.B. would still be evaluated for a 504 plan. If the latter is true, a jury could conclude Johnson's actions during and after the meeting amounted to a refusal to evaluate O.B. for a 504 plan. Defendant also asserts Plaintiffs never again requested MSD for an evaluation after O.B. returned to in-person learning. However, it is a disputed fact whether MSD received a second letter from Dr. Beck in November 2021 again recommending a 504 plan to accommodate O.B.

The Court finds a genuine issue of fact exists as to whether Defendant failed to evaluate O.B. in violation of Section 504.

### 2. Deliberate Indifference

Plaintiffs argue Defendant's repeated failure to evaluate O.B. for a 504 plan

1  despite repeated requests to do so rises to the level of deliberate indifference.  ECF

2  No. 21 at 19.

3      "Deliberate indifference requires both knowledge that a harm to a federally

4  protected right is substantially likely, and a failure to act upon that likelihood."

5  *Duvall*, 260 F.3d at 1139.  "When the plaintiff has alerted the public entity to his

6  need for accommodation (or where the need for accommodation is obvious, or

7  required by statute or regulation), the public entity is on notice that an

8  accommodation is required, and the plaintiff has satisfied the first element of the

9  deliberate indifference test."  *Id.* at 1139.  "[I][n order to meet the second element

10  of the deliberate indifference test, a failure to act must be a result of conduct that is

11  more than negligent, and involves an element of deliberateness."  *Id.*

12      Defendant contends MSD was never put on notice of O.B.'s need for an

13  accommodation after he returned to in-person learning.  ECF No. 32.  But as

14  previously stated, a genuine issue of fact exists as to whether Defendant received

15  the November 2021 letter from Dr. Beck.  If Defendant did, the first prong of the

16  deliberate indifference test would be met.  As to the second prong, a jury could

17  conclude Defendant's failure to respond to the November 2021 supports a

18  deliberate indifference finding.  However if the jury concludes Defendant did not

19  receive the November 2021 letter, it could reasonably find Defendant's actions, if

20  found to have violated Section 504, did not rise to the level of deliberate

indifference.  Or if the jury does conclude Defendant received the November 2021 letter, it could still find Defendant's failure to respond was an oversight that did not amount to deliberate indifference.

For these reasons, genuine issues of fact exist as to whether Defendant's actions amount to deliberate indifference.  Therefore, Plaintiffs' motion for partial summary judgment as to the claims under the Rehabilitation Act must be **denied** and Defendant's motion for partial summary judgment is **denied**.

### 3. *Duty and Breach of Duty*

Plaintiffs move for partial summary judgment as to the elements of duty and breach of duty of their negligence claim.  ECF No. 21 at 20.  Defendant does not dispute that MSD owed a duty to O.B. only that MSD did not breach that duty because it did not refuse to evaluate O.B. for a 504 plan, O.B. did not need a 504 plan, and none of the MSD employees acted unreasonably.  ECF No. 32 at 20.

To make a prima facie showing of negligence, Plaintiffs must show Defendant owed a duty of care to O.B., Defendant breached that duty, and the injury to O.B. was proximately caused by the breach.  *Hertog, ex rel. S.A.H. v. City of Seattle*, 138 Wash.2d 265, 275 (1999).  In Washington State, school districts owe a standard of ordinary care to protect their students from foreseeable harm. *Hendrickson v. Moses Lake Sch. Dist.*, 192 Wash. 2d 269, 278-79 (2018).  A school district's compliance with federal discrimination laws are relevant to

whether it exercised reasonable care. *Kok v. Tacoma Sch. Dist. No. 10*, 179 Wash. App. 10, 22 (2013). But whether a defendant actually breached its duty of care is generally a question of fact left to the jury, unless reasonable minds could not differ and the factual questions may be determined as a matter of law. *City of Seattle*, 128 Wash. 2d at 275.

Plaintiffs argue that Defendant's violation of Section 504 conclusively establishes MSD breached its duty of care to O.B.. ECF No. 21 at 21. However, it remains disputed in this case whether MSD did in fact violate Section 504 and failed to provide reasonable accommodations and services to O.B.. Therefore, it is disputed whether MSD breached its duty of care to O.B. and Plaintiffs' motion for summary judgment as to the breach of duty element must be **denied**.

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1. Plaintiffs' Motion to File Excess Pages (ECF No. 20) is **GRANTED**.

2. Plaintiffs' Motion for Partial Summary Judgment (ECF No. 21) is **DENIED**.

3. Defendant's Motion to Exclude Testimony of Amy Klosterman (ECF No. 24) is **GRANTED**.

4. Defendant's Motion for Partial Summary Judgment (ECF No. 26) is **DENIED**.

5. Defendant's Motion to Strike (ECF No. 51) is **GRANTED**.

6.  The Declaration of Jennifer L. Hervey-Langley (ECF No. 50) is

**STRICKEN**.

7.  Plaintiffs' Motion to Strike (ECF No. 53) is **DENIED**.

8.  Defendant's Motion to Amend Answer to RFA No. 2 (ECF No. 62) is

**GRANTED**.

The District Court Executive is directed to enter this Order and furnish copies to

the parties.

DATED March 6, 2025.



THOMAS O. RICE
United States District Judge

ORDER ON MOTIONS ~ 43